**ORIGINAL**

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

AUG 26 2019

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

| | |
|---|---|
| United States of America,<br><br>v.<br><br>Kelly Nichole Perry,<br><br>Defendant. | Case No.  **19 MJ 03524** |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of August 25, 2019, in the county of Los Angeles in the Central District of California, the defendant violated: 21 U.S.C. § 841(a)(1), possession with intent to distribute a controlled substance.

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Norman Tobias, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  _____Aug. 26, 2019_____

_____
*Judge's signature*

City and state:  Los Angeles, California

MARIA A. AUDERO
*Printed name and title*

**U.S. MAGISTRATE JUDGE**

## **AFFIDAVIT**

I, Norman Tobias, being duly sworn, declare and state as follows:

### I.    **PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of an application for a criminal complaint against Kelly Nichole PERRY ("PERRY") for a violation of Title 21, United States Code, Section 841(a)(1) (Possession with Intent to Distribute Controlled Substances).

2.    This affidavit is also made in support of a warrant to search PERRY's digital device (the "SUBJECT DEVICE") in the custody of the Drug Enforcement Administration ("DEA") in Los Angeles, California, as described more fully in Attachment A, for evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and

1

statements described in this affidavit are related in substance
and part only.

## II.   **BACKGROUND OF SPECIAL AGENT NORMAN TOBIAS**

4.    I am a Special Agent ("SA") with the Drug Enforcement
Administration ("DEA") and have been so employed since 1996.   I
am currently assigned to the DEA Narcotics Task Force at the Los
Angeles International Airport (the "DEA LAX Narcotics Task
Force"), which investigates criminal enterprises that use the
aviation system to transport large amounts of illicit drugs
throughout the United States and the world.   The DEA LAX
Narcotics Task Force consists of law enforcement officers from
the DEA, the Los Angeles World Airports Police Department, the
Los Angeles Police Department, and the Los Angeles County
Sheriff's Department.

5.    As a DEA SA, I have been involved in over 1,000 drug-
related investigations, including numerous investigations
involving drugs being trafficked through the aviation system.
In these investigations, I have conducted hundreds of interviews
of informants, cooperating sources, and suspects, and I have
personally arrested more than 250 drug-related offenders.   I am
familiar with the ways in which drug smugglers and bulk cash
smugglers use digital devices to facilitate and conceal their
criminal activities.   Before joining the DEA, I was a Border
Patrol Agent for the United States Border Patrol from August
1994 until July 1996.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

6.   On or about August 25, 2019, Transportation Security Administration ("TSA") officers at Los Angeles International Airport ("LAX") found approximately one kilogram of heroin and approximately 1.5 kilograms of marijuana in a vacuum-sealed package inside a suitcase checked in by PERRY.  PERRY was scheduled to fly on American Airlines flight #1297 ("AA1297") to Miami, Florida, that same day.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

7.   Based on my review of law enforcement reports, as well as my own observations and knowledge of the investigation, I am aware of the following:

**A.   Law Enforcement Discovers Drugs in PERRY's Checked Bag**

8.   According to an LAX Police Department ("LAXPD") incident report, No. 19-170934:

a.    On or about August 25, 2019, TSA Officer Louis Dang was assigned to conduct security screenings of checked luggage in the LAX Terminal 4 baggage screening room.  Officer Dang saw an alert on his assigned screening machine indicating that the machine had identified a suspicious bulk mass inside a piece of checked luggage.

b.    Through the screening machine, Officer Deng saw a suspicious object that appeared shaped like a brick inside of the suitcase he was screening. Officer Dang removed the suitcase from the screening machine, and saw it was a purple, Lucas-brand hard-sided suitcase. Officer Dang noted that the suitcase was

3

tagged for AA1297, departing LAX at 14:33 for Miami
International Airport.

        c.    Officer Dang opened the suitcase to search inside
it for any hazardous materials.  During the search, Officer Dang
discovered a vacuum-sealed brick-shaped object, and two
approximately 1-pound bags of a green leafy substance resembling
Marijuana.

        d.    Officer Dang then notified his supervisor, TSA
Supervisor Gary Burns.  TSA Supervisor Burns inspected the
suspicious packages located by Officer Dang, decided for safety
purposes not cut open the packages, and to notify LAXPD.

        e.    LAXPD Officers A. Prera and R. Outley responded
to TSA Supervisor Burns' request for assistance.  The LAXPD
Officers inspected the suspicious packages discovered by Officer
Dang, and based on the packaging and packing material, LAXPD
Officer Outley requested the assistance of the DEA LAX Narcotics
Task Force ("LAXNTF") for further investigation of the
suspicious packages.

        f.    While LAXNTF personnel, Task Force Officer
("TFO") Marlon Coronado and I were en route to the scene, the
LAXPD Officers inspected the tags attached to the bag containing
the suspicious packages. LAXPD Officers saw the bag had a name
tag for Kelly PERRY. The LAXPD Officers contacted American
Airlines representative Sean Ayars, who confirmed that the
purple suitcase containing the contraband belonged to passenger
Kelly PERRY.  Ayars confirmed that PERRY had checked in only one

4

bag, and that PERRY's ticket would be suspended when she attempted to board the aircraft at the gate.

g.   LAXPD Officers Garcia and Lozano met PERRY at the gate for her flight.   PERRY admitted that she had checked a purple suitcase, and that she was traveling to Miami.   The LAXPD Officers then took PERRY into custody.   LAXPD Officers subsequently transported PERRY to the LAXNTF office for further investigation.

9.   LAXNTF TFO Coronado responded to the TSA Terminal 4 baggage screening area, secured PERRY's suitcase and the contraband, and transported them back to the LAXNTF office with LAXPD officers.

10.   Based on my knowledge and experience of American Airline's standard practices at LAX, the passenger whose name is on the ticket (and baggage tag) must be physically present and provide a valid photo identification matching their name and date of birth on the reservation in order to check a bag or suitcase, at which point that passenger's name (and not someone else's) will be printed on the tag that is then immediately affixed to the bag or suitcase.   The identification of the name PERRY on the purple Lucas brand suitcase, in my experience, therefore means that PERRY checked her purple Lucas brand suitcase in person with American Airlines upon arriving at the airport.   American Airlines then typically takes custody of the bags or suitcases from the ticketed passenger, making it highly unlikely that someone else removed the tag from the checked

5

suitcase and placed it on a different suitcase after PERRY checked it in.

11.   Law enforcement found the SUBJECT DEVICE in PERRY's possession at the time of her arrest.   LAXNTF took possession of the SUBJECT DEVICE.

**B.    A Package of Drugs in PERRY's Suitcase Tests Positive for Heroin**

12.   At the LAXNTF office, I donned personal protection equipment and began testing the 1-kilogram sized package found in PERRY's suitcase with a TruNarc Raman spectrometer used for the rapid identification of suspected narcotics.   The package tested positive for the presence of Heroin, with a gross weight of 1.19 kilograms, including packaging.

**C.    PERRY's Statements**

13.   At the LAXNTF office, I read PERRY her <u>Miranda</u> warnings, as witnessed by TFO Coronado.   PERRY agreed to speak and signed an Advice of Rights/Waiver of Right form.   PERRY stated the following during her interview:

a.   PERRY stated she accepted an invitation for an all-expenses-paid trip with a person she only knew as "Spud". She was traveling with "Spud" because he wanted some female company.   The invitation came from a relative PERRY refused to identify.

b.   On August 25, 2019, PERRY took an Uber ride from her residence in North Hills to a residence in Compton where she met "Spud" for the first time.   "Spud" instructed her to place all her clothes in the purple suitcase which was already packed

6

on one side.  PERRY stated that no one opened the purple
suitcase after she closed it.  PERRY and "Spud" then took an
Uber to LAX.  PERRY was subsequently arrested but "Spud" made it
on the flight.  PERRY denied knowing about the presence of
narcotics in her luggage.

       c.   When I showed PERRY surveillance footage of her
checking in with a man subsequently identified through American
Airline travel records as Emmanuel Montgomery Wright ("Wright"),
and asked her to confirm that "Spud" was Wright, PERRY became
uncooperative and responded "you've got eyes, you can see."

**D.    Further Investigation of PERRY and Wright**

    14.   I also know, based on my conversations with American
Airlines corporate security personnel, that:

       a.   The airline tickets for Wright and PERRY were
both purchased at approximately the same time through the
Priceline online travel service.

       b.   Wright checked in for flight AA1297 from LAX to
Miami, at the same time as PERRY.  When Wright checked in, he
also checked one large hard-sided suitcase.

       c.   Wright boarded AA1297, and was observed on the
aircraft by American Airlines flight crew.

    15.   I have reviewed LAX surveillance footage that shows
PERRY traveling through the airport with a black male wearing a
grey baseball cap, a dark shirt and silver shorts. This video
surveillance also shows Wright and PERRY checking in at the same
American Airlines kiosk at approximately the same time.  I have
reviewed a criminal history report for Wright, which includes

"Spud" as a known alias for Wright.  Consequently, I believe that the individual PERRY described as "Spud" is Wright.

16.  When AA1297 arrived in Miami, Florida, Wright evaded detection by law enforcement personnel.  DEA personnel at Miami International Airport located the bag Wright had checked in, a silver colored Aimee Kestenberg brand hard-sided suitcase, with an attached baggage tag (#AA013779) in the name of Emmanuel Wright.  Wright's checked bag was abandoned at the baggage claim terminal at Miami International Airport.  Upon inspection by law enforcement personnel, there was a strong odor of marijuana emanating from the suitcase.  Wright's suitcase is currently en route to the DEA in Los Angeles for further investigation.

**V.   TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING**

17.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Los Angeles is a major hub for drug distribution. Partly because of the close proximity of Los Angeles to the Mexican border, prices of drugs are generally lower here than prices on the east coast.  Drugs enter Los Angeles from across the Mexican border or overseas from Asia and are then distributed across the country.  LAX is commonly used to facilitate drug transportation for Drug Trafficking Organizations, who send their couriers through LAX with drugs in their luggage.  Numerous drug arrests are made at LAX every year, with couriers transporting drugs in checked bags.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.   Because drug traffickers usually continue to sell drugs to support themselves until they are arrested, their communications with various co-conspirators tend to be ongoing until their arrest.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.  It is also common for drug traffickers to carry cellular telephones in order to remain in contact with drug suppliers or customers, to communicate with co-conspirators to facilitate drug trafficking, to coordinate the movements of the trafficker and various co-conspirators, and to coordinate the amount of drugs trafficked, as well as payment amounts and methods.  Based on my training and experience, I

9

know that the above-described information can be stored on digital devices carried by drug traffickers.

        d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data, such as Global Positioning System ("GPS") information, other locational information, and identifying information about the trafficker and co-conspirators and the location of previous drug transactions or stash houses, and/or the identity or whereabouts of traffickers and co-conspirators involved in narcotics trafficking.

        e.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

18.  As used herein, the term "digital devices" includes the SUBJECT DEVICE.

19.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

11

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

20.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data in a short period of time for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000

12

average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

21. The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a. Users may enable a biometric unlock function on
some digital devices. To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device. To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second. To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts. Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time. I do not know
the passcodes of the devices likely to be found in the search.

c. The person who is in possession of a device or
has the device among his or her belongings is likely a user of

13

the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress PERRY's thumb- and/or fingers on the device(s); and (2) hold the device in front of PERRY's face with her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

22.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

## VII.  CONCLUSION

23.  Based on the foregoing, there is probable cause to believe that Kelly Nichole PERRY violated Title 21, United States Code, Section 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and that evidence of the Subject Offenses as described in Attachment B will be found on the SUBJECT DEVICE described in Attachment A.

NORMAN TOBIAS
Special Agent
Drug Enforcement Administration

Subscribed to and sworn before me
this 26th day of August, 2019.

THE HONORABLE   MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE

15

**ATTACHMENT A**

DEVICE TO BE SEARCHED

The following cellular telephone (the "SUBJECT DEVICE"), seized by the Drug Enforcement Administration on August 25, 2019, from Kelly Nichole PERRY and currently maintained in the custody of the Drug Enforcement Administration in Los Angeles, California: one black Alcatel mobile telephone with dark grey backing with no visible serial number or IMEI.

## ATTACHMENT B

### I.   ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 846 (conspiracy to distribute and possess with intent to distribute controlled substances) and 841 (distribution and possession with intent to distribute controlled substances) (the "Subject Offenses"), namely:

a.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

b.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

c.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from the SUBJECT DEVICE and which relate to the Subject Offenses;

d.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook

ii

Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from the SUBJECT DEVICE and which relate to the Subject Offenses;

      e.  Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

      f.  Audio recordings, pictures, video recordings, or still captured images relating to the possession or distribution drugs and the collection or transfer of the proceeds of the Subject Offenses;

      g.  Contents of any calendar or date book;

      h.  Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

      i.  Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

      j.  With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized :

          i.  evidence of who used, owned, or controlled the devices at the time the things described in this warrant were

iii

created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of software that would allow others to control the devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the devices;

v.  evidence of the times the device was used;

vi.  passwords, encryption keys, and other access devices that may be necessary to access the devices;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the devices or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the devices;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search

iv

terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.  SEARCH PROCEDURE FOR THE SUBJECT DEVICE

3.   In searching the SUBJECT DEVICE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICE as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

     d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

     i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

     ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

     iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

     e.   If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

f.    If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.    If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.    If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.    The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period,  obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.    After the completion of the search of the SUBJECT DEVICE, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.    During the execution of this search warrant, law enforcement is permitted to (1) depress Kelly Nichole PERRY's thumb- and/or fingers onto the fingerprint sensor of the SUBJECT DEVICE (only if the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Kelly Nichole PERRY's face with her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

5.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.